## THE RALPH M. HAYWARD.[*]

*(District Court, E. D. Pennsylvania. April 21, 1882.)*

ADMIRALTY—COLLISION—CONFLICT OF TESTIMONY—MUTUAL FAULT.

Two vessels collided on a dark and stormy night. The testimony as to the cause of collision was in direct and irreconcilable conflict. It appeared, however, that there was a want of vigilance on both sides, and that although the libellant was primarily responsible, the respondent having the right of way, yet the respondent had executed a wrong maneuver, which probably contributed to cause the collision, and also proceeded on her course without stopping to ascertain the extent of libellant's injury. *Held*, that the damages should be equally divided.

Libel by the owners of the schooner Joseph H. Huddell, Jr., against the barkentine Ralph M. Hayward, to recover damages for a collision.

The collision occurred in the Alantic ocean, opposite Absecom light, on the New Jersey coast, about midnight, on November 19, 1881. The night was dark and stormy, the wind blowing a gale. The exact direction of the wind was in dispute, libellants alleging that it was north-west, and respondents that it was west-north-west. The schooner was bound up the coast on a voyage from Philadelphia to Boston with a cargo of coal. The barkentine was bound down

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

the coast in ballast. The testimony as to the cause of the collision was in direct conflict.

On behalf of the libellants it was testified that the schooner was sailing a course of about N. E. by N., and first discovered the barkentine's green light about two points off the starboard bow, and from half a mile to a mile distant; that the schooner's helm was put to starboard until the green light was three or four points off the starboard bow; that the barkentine then attempted to luff across the bow of the schooner, showing both her lights, and immediately thereafter striking the schooner on her starboard quarter.

On behalf of the respondent it was testified that the barkentine was sailing a course of about south-west, or a little to the southward of that point, close-hauled, and on the starboard tack; that the green light of the schooner was seen about a point and a half on the port bow, at a distance of about two miles; that the barkentine, having the right of way, held her luff, and that when the vessels were close together the schooner attempted to cross the barkentine's bows from port to starboard; that in the moment of peril, and in order to avert the impending disaster the barkentine's helm was hove up with the hope of passing under the schooner's stern, but that it was too late to avoid the collision. It appeared that up to the time of striking the barkentine all hands on board the schooner had been engaged in shortening sail, and that no lookout was stationed until shortly before the collision. It also appeared that, although it was the master's watch on board the barkentine, he had gone below, leaving the deck in charge of the second mate; that just prior to the collision the lookout on the barkentine sang out to the man at the wheel to "hard up," but that the second mate countermanded this order and ordered the man at the wheel to luff, which was done. It further appeared that the schooner sank in consequence of the collision, and that the barkentine proceeded on her course without rescuing the crew, who were subsequently taken off by a passing steamer. In excuse of this it was testified by those on board the barkentine that they did not know the schooner had been seriously damaged by the collision.

*Alfred Driver* and *J. Warren Coulston*, for libellant.

*Theodore M. Etting* and *Henry R. Edmunds*, for respondent.

BUTLER, D. J. Libellant has the burden of proof. The testimony is in direct, irreconcilable conflict. If libellant's is true she was free from fault, and her antagonist wholly blamable; if respondent's is believed she was blameless, and the libellant alone in fault. It is quite clear respondent had the right of way. She

was close-hauled, and on her starboard tack. It was therefore libellant's duty to keep out off and hers to hold her course.

The case having been heard during juryperiod of the circuit court, and an early decision being required by the peculiar circumstances, I have time to do no more than indicate the grounds on which the decree rests.

While it may be irreconcilable with libellant's testimony, the conclusion is reasonable, from all the evidence, that the parties when first aware of each other's presence, were meeting very nearly head on. The lookout of libellant was deficient, (while the character of the night and weather demanded unusual vigilance,) and respondent consequently was not seen, I believe, until the vessels were near together. It seems quite probable, and I believe it to be a fact, that when the libellant ported her helm and changed her course she was brought across the respondent's bows, in dangerous proximity. She was in fault, therefore, in failing to discover the respondent as early as she should have done, and in failing to keep off. What her witnesses say respecting lights, distances, and positions of the respective vessels, and the theory upon which her case is rested by counsel, cannot be accepted. They are not only inconsistent with probabilities, but, as the assessors report, are actually disproved by the collision itself. As these gentlemen say, no collision could have taken place if the facts were as here stated; it was a nautical impossibility.

I find, however, that respondent also was in fault. Notwithstanding the character of the night and weather, her officers' conduct shows great want of vigilance. Three men alone were on deck at the time; the captain and mate both being below. When the light was seen the captain was not called, and the second mate, who was on deck, appears, from his acts to have been reckless or incompetent. While the lookout, who saw what was necessary to be done, gave the proper order to the man at the wheel, the mate countermanded it, and brought the vessel further up into the wind—the direct tendency of which was to render the collision inevitable. It is improbable the vessel made material headway in this new direction, but the change of course necessarily tended to the result which followed. I do not think it can properly be said that the vessel was actually in peril when this change was made. It is quite clear that if the order given by the lookout had been obeyed, the collision would have been avoided. It is true the libellant should not have made any change in the respondent's course neces-

sary, but in view of the night and weather, and other attendant circumstances, it certainly was the respondent's duty to execute the maneuver ordered by the lookout. Furthermore, it cannot be known that the libellant would not have escaped, notwithstanding her fault, if the respondent had not made the blunder—her conduct in going off without ascertaining the extent of injury inflicted was also inexcusable. The circumstances were such as to justify serious apprehension for the libellant's safety. It was her duty, therefore, to ascertain the extent of the injury, and the necessity for help, or the absence of it, before pursuing her course.

In view of the facts the libellant should have a decree for half damages.

The court propounded certain questions to two nautical experts, called as assessors, which, with the answers thereto, were as follows:

1. Suppose the courses and positions of the respective vessels to have been such as the libellant states, and as his counsel illustrated on the blackboard in your presence, could the collision have occurred?

If you answer that it could not, give your reasons fully for this conclusion.

*Answer.* That we have no hesitation in saying the collision, under the circumstances as stated by the libellant, could not have occurred, for the reasons that the schooner steering N. E. by N., making a green light two points on her starboard bow, shows that she has passed the line on which that vessel was steering, and also shows that that vessel must be steering to the southward of S. W. by W., for if steering up this high both lights would be seen, and if any higher the red alone; therefore the schooner had passed the line of all danger, and her course was constantly increasing the distance. When the schooner hauled up N. by E., bringing the green light four points on the lee bow, she would be increasing the distance more rapidly.

The wind, as stated, being N. W., the bark could head W. S. W. if the wind and sea were moderate; but being stormy—blowing a gale—and she being under short canvas and light, she would vary and fall off a point to leeward, and would make one if not two points leeway, which would give her a course of S. W. to S. W. by S. through the water.

2. May the difference in the direction of the wind stated by the parties be reconciled by the fact that the vessels were running in opposite directions; in other words, if the libellant found the wind as she states, would the respondent probably find it as she describes?

*Answer.* The apparent difference in the direction of the wind between N. W. and W. N. W. is only two points, and to two vessels steering in opposite directions their velocity would make the wind appear more ahead, especially when blowing heavily, and would account for that difference.

3. Was there any excuse for the order given by the bark's mate turning the vessel further up into the wind? How do you explain the mate's conduct in this respect?

*Answer.* The bark being by the wind on the starboard tack, having the right of way, we see no excuse for putting the helm down, as it would tend to shoot her up to windward and across the schooner's track. If she had kept her course the probability is she would have gone clear, for by her luffing in the wind she barely managed to hit the schooner.

After her luffing, when she would lose her way, it would take some time for her to get sufficient headway for the helm to act to keep her off.

The action of the mate we cannot understand; as, when the light was seen and likely to come near, it was certainly his duty to have called the captain, and let him do what maneuvering he thought necessary. His action seems to have been without any thought or even ordinary judgment.